# .UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF NEW YORK

№ 21-MJ-39 (RER)

IN THE MATTER OF THE EXTRADITION OF
HENRY CLAUDE MEDNARD

**MEMORANDUM & ORDER**

**April 5, 2021**

**RAMON E. REYES, JR., U.S.M.J.:**

The United States of America (the "government"), acting on behalf of the Republic of Korea, filed a complaint on January 14, 2021, seeking an arrest warrant for the extradition of Henry Claude Mednard ("Mednard" or "Relator"), pursuant to 18 U.S.C. § 3184. (Dkt. No. 1 ("Cmpl.")). Mednard was subsequently arrested and arraigned, and he moved for release on bail. For the reasons stated herein, Mednard's application for release is denied.

## BACKGROUND[1]

Mednard, who at the time was stationed in Korea as a member of the United States Army,[2] was allegedly involved in two domestic violence incidents on September 2 and 5, 2005. According to the extradition request, Mednard was accused of choking, punching and slashing his live-in girlfriend with a fruit knife, and slashing a friend who came to her aid. (Cmpl. at 35-37, ¶¶ 3.1.1-3.2.4). On September 5, 2005, Korean police interviewed Mednard and the alleged victims. (*Id.* at 37-38, ¶¶ 3.2.5-3.2.7). "Mednard was never officially arrested" (Dkt. No. 14 at 6), and he departed Korea on November 3, 2005 (Cmpl. at 38-39, ¶ 3.2.9). Mednard was not indicted by the Korean prosecutor until December 29, 2005, after he had already left the country. (*Id.* at 39, ¶ 3.2.11). Mednard reported to Pretrial Services that after he left in Korea in 2005, he lived and worked in Iraq, Afghanistan and Thailand, and then returned to the United States in 2008.

On January 2, 2006, the presiding judge in Korea set Mednard's trial for January 14,

[1] These facts are drawn from the complaint, the parties' proffers on the record, and their written submissions.

[2] According to Mednard, on November 17, 2005, he was honorably discharged from active duty and became a member of the Army Reserves.

2006, and ordered him served with the indictment and summons to appear. (*Id.* at 39-40, ¶ 3.3.1). Service was attempted at Mednard's "residential address" (*id.*) -- 139-9 Sinjang-dong, Pyeongtaek-si, Geyonggi-do -- where Mednard purportedly had resided with the victim and where the domestic violence incidents allegedly occurred. Service, however, was not effected on Mednard. (*Id.* at 40, ¶ 3.3.1 ("[T]he documents were returned due to an unknown address . . .."). The presiding judge subsequently adjourned the trial twice, ordered the prosecutor to find a proper address for Mednard and have him served with the indictment and summons to appear. (*Id.* at 40, ¶¶ 3.3.1-3.3.2). Each time, however, the previous address was confirmed as Mednard's residential address but the "documents were returned due to unknown address (meaning such address did not exist)." (*Id.* at 40, ¶ 3.3.2)

On April 30, 2006, Mednard returned to Korea on his own volition and openly resided with the victim at the same address where the domestic violence incidents occurred, and where service of the indictment and summons had been attempted. (Cmpl. at 39, ¶ 2.2). On May 11, 2006, while Mednard was in Korea, the presiding judge set Mednard's "trial date as June 14, 2006 at 11:00 and had the indictment and the writ of summons re-served." (*Id.* at 40, ¶ 3.3.3). The papers, however, were once again "returned due to unknown address", with the chief of police reporting to the presiding judge that "such address did not exist and failed to locate MEDNARD." (*Id.*). On May 16, 2006, Mednard left Korea and has never returned. (*Id.* at 39, ¶ 3.2.9; 42, ¶ 3.3.9).

Thereafter, from May 2006 to March 2016, the presiding judge issued nine arrest warrants and attempted to have them served on Mednard in Korea, all to no avail. (*Id.* at 40-44, ¶¶ 3.3.4-3.3.17, 3.3.19). During this period the presiding judge was informed on four occasions that Mednard left Korea on May 16, 2006 and had not returned since. (*Id.* at 41-43, ¶¶ 3.3.6, 3.3.9, 3.3.11, 3.3.15).

On March 25, 2016, the Korean prosecutor sought modification of Mednard's indictment as the Constitutional Court of Korea had recently ruled that one of the statutes under which Mednard had been indicted was unconstitutional. (*Id.* at 44, ¶ 3.3.18). Thereafter, on March 30, 2016, the presiding judge decided to serve Medndard "publicly" via the court's "bulletin board" in Korea. (*Id.* at 45, ¶ 3.3.20, and at 41, ¶ 3.3.6). At that time the presiding judge set Mednard's trial for April 20, 2016. (*Id.* at 45, ¶ 3.3.20).

When Mednard did not appear for his trial on April 20, 2016, the presiding judge adjourned the trial to May 11, 2016, and ordered that if Mednard did not appear the trial would take place in absentia pursuant to Korean law. (*Id.* at 45, ¶ 3.3.21). The Korean judge also had Mednard served with such notice publicly on the court's bulletin board. (*Id.*)

When Mednard did not appear for trial on May 11, 2016, the Korean judge proceeded with the trial in absentia. (*Id.* at 45, ¶ 3.3.22). The requested indictment modification was granted and the judge entertained the prosecutor's presentation of the evidence without hearing from any witnesses. (*Id.*) At the conclusion of the presentation, the prosecutor recommended imposition of a three-year sentence. The judge, however, again adjourned the trial to May 20, 2016, and ordered notice to Mednard through the public bulletin board. (*Id.*) When Mednard

again failed to appear on May 20, 2016, the judge examined the prosecutor's evidence "via judgment document" and "pronounced an adjudication of imprisonment for two years." (*Id.* at 46, ¶ 3.3.23).

The Korean authorities subsequently contacted Interpol to ascertain Mednard's whereabouts. On September 7, 2016, Interpol informed the Korean authorities that Mednard was in the United States. (*Id.* at 46, ¶ 3.4). Nearly one year later, on August 1, 2017, Korea sought Mednard's extradition. (*Id.* at 8, ¶ 3).

**DISCUSSION**

I. Extradition Bail Standard

The "standard for release on bail for persons involved in extradition proceedings is a more demanding standard than that for ordinary accused criminals awaiting trial" and, therefore, the normal presumption in favor of bail is not applicable. *Hu Yau–Leung v. Soscia*, 649 F.2d 914, 920 (2d Cir. 1981) (citing *Wright v. Henkel*, 190 U.S. 40, 62, 23 S.Ct. 781, 47 L.Ed. 948 (1903). Indeed, "the reverse is rather the case." *Beaulieu v. Hartigan*, 554 F.2d 1, 2 (1st Cir. 1977)). Bail is the exception not the rule.

In addition, to showing by clear and convincing evidence that he is neither a risk of flight nor a danger to the community, the relator must establish that "special circumstances" exist that warrant his release. *See Salerno v. United States*, 878 F.2d 317, 317 (9th Cir. 1989). "Under the special circumstances standard, admission to bail 'should be an unusual and extraordinary thing,' and courts should exercise the power sparingly." *Lo Duca v. United States*, No. 95–CV-713 (DGT), 1995 WL 428636, at *15 (E.D.N.Y. July 7, 2005) (quoting *United States ex rel. McNamara v. Henkel*, 46 F.2d 84 (S.D.N.Y. 1912), and citing *In re Klein*, 46 F.2d 85 (S.D.N.Y. 1930)), *aff'd* 93 F.3d 1100 (2d Cir. 1996), *cert. denied* 519 U.S. 1107 (1996).

"The trial judge has discretion to decide what constitutes special circumstances, and the 'list of potential 'special circumstances' is not limited to those previously recognized in published decisions[,]' as such decisions are merely instructive." *In re Extradition of Kapoor*, No. 11-M-456 (RML), 2011 WL 2296535, at *3-5 (E.D.N.Y. June 7, 2011) (quoting *In re Extradition of Gonzalez*, 52 F. Supp. 2d 725, 736 (W.D.La. 1999) (citing *Beaulieu*, 554 F.2d at 1)). Nevertheless, it is worth noting that courts have held special circumstances present where the relator has:

> (1) raised substantial claims which have a high probability of success on the merits; (2) suffered a serious deterioration of health; (3) shown that there is an unusual delay in the appeals process; (4) shown that the extradition proceeding will be unusually long and complex; (5) shown that the requesting country would grant bail in a comparable extradition case; and (6) shown by clear and convincing evidence that bail is available for the substantive offense in the requesting country.

*Lo Duca*, 1995 WL 428636, at *15 (citing *In re Extradition of Nacif–Borge*, 829 F. Supp. 1210, 1216–19 (D. Nev. 1993)). In addition, "[r]elated to the issue of delay in extradition proceedings, courts have found special circumstances when 'there is a lack of any diplomatic necessity for denying bail.'" *United States v. Castaneda–Castillo*, 739 F. Supp. 2d 49, 56 (D. Mass. 2010) (citing *In re*

*Extradition of Chapman*, 459 F.Supp.2d 1024, 1027 (D. Haw. 2006)).

II. Special Circumstances

Mednard argues that a number of "special circumstances" exist, individually and collectively, that warrant his release, including (1) that he is a citizen of the United States;[3] (2) the complexity and anticipated length of the extradition proceedings;[4] (3) the ongoing COVID-19 pandemic and his underlying health condition;[5] (4) his likelihood of success on the merits;[6] (5) the availability of bail in Korea;[7] and (6) the lack of diplomatic necessity for denying him bail. (Dkt. No. 9). Only one of these purported "special circumstances", however, merits any discussion – the lack of diplomatic necessity for denying bail in light of the more than decade-long delay in prosecuting Mednard and seeking his extradition.

While I am not unsympathetic to Mednard's argument regarding the delay between the alleged incident and the request for his extradition, I cannot say that it constitutes a special circumstance warranting his release. As discussed above, the Korean authorities investigated the domestic violence incident within days, including interviewing Mednard. Mednard was indicted within three months. Thereafter, Mednard was actively prosecuted by the Korean authorities for ten years, and but for their inability to locate him in Korea, the prosecution likely would have concluded much sooner. I cannot fault the Korean court for extending the proceedings for this long period, all in an effort to locate Mednard and

---

[3] The fact that a relator may be a United States citizen (Dkt. No. 9 at 9) generally does not constitute a special circumstance warranting bail. *E.g., In re Extradition of Sacirbegovic*, 280 F. Supp. 2d 81, 84-85 (S.D.N.Y. 2003). I see no reason here to determine otherwise.

[4] While Mednard raises several issues implicating the complexity and length of the extradition proceedings – (1) "Ex Post Facto" modification of the indictment; (2) lack of compliance with the Status of Forces Agreement ("SOFA"), T.I.A.S. No. 6127 (U.S. Treaty), 17 U.S.T. 1677 (U.S. Treaty), 1967 WL 90121 (U.S. Treaty); (3) his *in absentia* trial; and (4) the "staleness of the prosecution" – the passage of time between the domestic violence incidents and Mednard's conviction *in absentia* (Dkt. No. 9 at 9-10) -- each can be resolved expeditiously at a prompt extradition hearing, which is currently set for April 12, 2021. Moreover, none of these issues involve the Court's limited role to determine whether Mednard should be extradited. *E.g., Cheung v. United States*, 213 F.3d 82, 88 (2d Cir. 2000) (recognizing the court's limited role to determine: "whether a valid treaty exists; whether the crime charged is covered by the relevant treaty; and whether the evidence marshaled in support of the complaint for extradition is sufficient under the applicable standard of proof."); *Lo Duca*, 93 F.3d 1100, 1103-04 (similar).

[5] While the ongoing COVID-19 pandemic presents difficult circumstances for all detained defendants, the pandemic does not present "special circumstances" for Mednard such that he should be granted bail. His "sleep apnea" does not warrant release on bail, especially as the detention facility has indicated that it will permit him to use his personal sleeping device while incarcerated. Moreover, other courts have found that the risk of contracting COVID-19 is insufficient to constitute "special circumstances." *Matter of Extradition of Carr*, 2020 WL 4816052, at *5 (N.D. Ill. Aug. 18, 2020) (collecting cases).

[6] At this point the Court cannot determine Mednard's likelihood of success on the merits as a hearing on the extradition request has not occurred. However, given the Court's limited role in the extradition context it appears unlikely that Mednard's substantive arguments will be deemed compelling. *E.g., Cheung*, 213 F.3d at 88 (recognizing court's limited role in extradition proceedings); *Lo Duca*, 93 F.3d at 1103-04 (same).

[7] The availability of post-conviction bail in Korea has not been established.

provide him notice of the charges pending against him. And while in retrospect the prompt resolution of the charges against Mednard may have been better served had the Korean authorities contacted the United States to ascertain Mednard's whereabouts, their failure to do so does not indicate that they were uninterested in the case against him. Moreover, the period of time between Mednard's conviction (May 2016) and the request for his extradition (August 2017), fifteen months, is relatively brief.

Those cases in which delays in prosecutions and requests for extradition have been found to constitute special circumstances reflect that the requesting nation has not made the prosecution a priority. *E.g.*, *United States v. Bowman*, No.: 19-MJ-05089-JLB-1, 2020 WL 835342, * 6 (S.D.Ca. Feb. 20, 2020) (collecting cases). Here, I do not find that the ten-year delay reflects that Korea did not make Mednard's prosecution a priority. *E.g.*, *Matter of Extradition of Drumm*, 150 F. Supp. 3d 92, 98-99 (D. Mass. 2015) (finding that seven-year delay in seeking extradition not a special circumstance warranting bail). Accordingly, the delay does not constitute a special circumstance warranting Mednard's release on bail.

III. Risk of Flight and Danger to Community

As stated above, in addition to showing that a special circumstance exists, a party seeking bail in an extradition case needs to demonstrate that he or she is not a risk of flight or a danger to the community. The government contends that Mednard is both a flight risk and a danger to the community. (Opp'n Mem. at 6.) I disagree.

With respect to dangerousness, the government's reliance on the Korean charges and Mednard's 2011 guilty plea to a domestic violence incident that resulted in a violation is misplaced. This "violent history" is exactly that, history. As Mednard correctly notes, these incidents occurred ten years ago and since then Mednard has not shown any violent propensities. I find that despite this history, Mednard has established by clear and convincing evidence that he currently is not a danger to the community.

The same is true with respect to his risk of flight. Mednard, a naturalized United States citizen, has lived openly in the United States for over a decade and has significant ties to New York City -- his wife and child live here. His United States passport has already been seized. Despite having family in the Dominican Republic and having made misstatements to Pretrial Services regarding his employment and residence, I find that Mednard has established by clear and convincing evidence that with appropriate conditions of release, *e.g.*, a significant bond with home detention and GPS monitoring, he does not represent a risk of flight.

Nevertheless, because Mednard has not established special circumstances warranting his release, his request must be denied.

**CONCLUSION**

For the foregoing reasons, Mednard's application for bail is denied. The Court will hold the extradition hearing on April 12, 2021 at 9:00 a.m. via video conference.

SO ORDERED

/s/Ramon E. Reyes, Jr.
Ramon E. Reyes, Jr.
United States Magistrate Judge